UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE CAMACHO, | Case No. 17-05168 EJD (PR) |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |
| R. RACKLEY, Warden, | |
| Respondent. | |

Petitioner filed a <u>pro se</u> petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. The Court found the petition (Docket No. 5, "Petition"), stated cognizable claims which merited an answer from Respondent. (Docket No. 7.) Respondent filed an answer on the merits. (Docket No. 13, "Answer"). Despite three extensions of time (Docket Nos. 16, 18, 20), Petitioner failed to file a traverse. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

## I. BACKGROUND

On May 19, 2011, Petitioner was found guilty by a jury in Contra Costa County Superior Court ("trial court") of first-degree murder of three people, conspiracy to commit murder, and participation in a criminal street gang. (<u>See</u> Pet. at 8.) Petitioner was sentenced to two consecutive terms of life in prison without possibility of parole, plus an additional sentence of 95 years to life. (<u>See id.</u>)

On July 6, 2016, the California Court of Appeal ("state appellate court") affirmed the judgment in a reasoned opinion, (Ans., Ex. 13[1]; see also People v. Camacho, No. A132875, 2016 WL 3680119, at *1 (Cal. Ct. App. July 6, 2016)), but remanded to the trial court in part with directions to delete a 10-year gang enhancement to Petitioner's sentence (see id.). The California Supreme Court summarily denied a petition for review on October 12, 2016. (Exs. 15, 16.)

Petitioner filed the instant habeas petition on October 5, 2017.

## II. STATEMENT OF FACTS

The following facts are taken from the opinion of the state appellate court on direct appeal:

### A. Prosecution's Case in Chief

The prosecution's theory of liability was that 13 actively-engaged members of the Varrio Frontero Loco (VFL), a Sureno criminal street gang, whose territory was the City of Richmond (Richmond), had entered into a conspiracy to "bring back the hood" to gain increased respect for the gang, by, among other things, committing murders and assaults against rival Norteno gang members in their territory of the City of San Pablo (San Pablo). [FN4] Defendant was alleged to be a conspiratorial gang member of the VFL. [FN 5] Although not every member of the conspiracy was present at each crime, the prosecution's theory was that each co-conspirator was liable for the acts, both intended and reasonably foreseeable, of his co-conspirators. The "net result of this conspiracy" was the death of several people, including Luis Perez, Lisa Thayer, and Rico McIntosh.

[FN4. San Pablo is completely surrounded by Richmond.]

[FN5. The indictment filed against defendant named as alleged co-conspirators: Cole Azamar (Azamar), Luis Hernandez (Hernandez), Hector Molina–Betances (Molina), Francisco Romero, Jorge Sanchez (Sanchez), Jose Martinez, Frank Rubalcava, Fernando Garcia, Jose Mota–Avendano (Mota), Larry Valencia, Javier Gomez (Gomez), and Gamaliel Elizalde (Elizalde). All of the named co-conspirators were alleged members of the VFL gang, except for Gomez, an alleged member of the Mexican Locos gang, a Sureno gang that associated with the VFL gang.

---

[1] Because Petitioner filed no traverse and attached no exhibits to the Petition, all future references to an "Exhibit" will refer to an exhibit attached to Respondent's Answer.

The indictment also included charges of murder, conspiracy, participation in a criminal street gang, against Azamar and Hernandez, who are not parties to this appeal.]

**1. Conspiracy to Commit Murder and Assault with a Deadly Weapon (Count 2) and Participation in a Criminal Street Gang (Count 3)**

To demonstrate that defendant was an active participant in the VFL gang, and had conspired with other gang members to commit murders and assaults with a deadly weapon, the prosecution presented, in pertinent part, the sworn testimony and out-of-court statements of VFL gang members Sanchez [FN 6] and Ruelas [FN 7] and Mexican Locos (ML) gang member and VFL associate gang member Victor Cervantes (Cervantes) [FN 8].

[FN6. By the time of the trial, Sanchez was 23 years old, and had been out of the VFL gang for three years.]

[FN7. Before defendant's trial, Ruelas had been placed in a witness protection program and was given money to move to Las Vegas and Redding. By the time of defendant's trial, Ruelas had violated his witness protection agreement and he was "kicked out" of witness protection and informed that the District Attorney's office could no longer help him. Ruelas did not testify at defendant's trial. The jury heard audio-tapes of his statements to the police and approximately six hours of a video-taped conditional examination. The prosecutor and defense counsel also read to the jury portions of Ruelas' testimony that was elicited at grand jury proceedings and earlier VFL gang prosecution trials.]

[FN8. Cervantes testified that in exchange for his testimony, he got a "six years suspended state prison [sentence] and a strike on [his] record" for an "assault with a deadly weapon in Richmond in 2007." Cervantes claimed he had assaulted Nortenos who were throwing rocks at his car. By the time of the trial, Cervantes was in protective custody because he had received calls from persons threatening his life.]

The VFL and ML gangs were Richmond Sureno gangs. The rivals of the Surenos were members of the Norteno gang, whose territory was primarily in the Broadway area of San Pablo. The VFL gang relied on violence to create fear and respect and to control its territory. When Ruelas was recruited in 2001 or 2002, he was told by then VFL leader Victor Valencia and his younger brother Jose Valencia, that the gang "need[ed]

some people like [Ruelas] to bring the hood back." Ruelas was expected to "do whatever to make the hood come up," including "shootings, robbing, drug dealing, all kinds of stuff." Ruelas worked his way up the gang hierarchy by shooting and beating rival Norteno gang members. When gang members had nothing to do or were bored, they would drive around San Pablo, "just go looking for people to kill, basically." In addition to San Pablo, VFL gang members could find Nortenos to shoot and kill, in "Montalvin, Pinole, De Anza, everywhere. Everywhere except in Richmond." Ruelas testified that before defendant became a member of the VFL, defendant rode along with gang members and if someone had to be shot, defendant would get out of the car and ask to shoot the person to earn respect. According to Ruelas, defendant "got caught up with one of our guns at a store, so he went to Byron" Boys ranch for nine months. After defendant came out, he got jumped into the VFL gang, according to Ruelas.

Sanchez testified that when he started in the VFL he had heard of defendant but did not know him because defendant was "in juvenile hall or the ranch." Sanchez did not meet or ever see defendant until "jail." However, Sanchez spoke with Mota and Ruelas about defendant's participation in the VFL. When asked, "Where was [defendant's] position supposed to be in the conspiracy," Sanchez replied that defendant was "in the regular VFL," "just ... doing his own thing on the side," "always in the ranch or ... just riding along with different people," "just stealing cars," and "attacking rival gang members," which was "part of being VFL." According to Sanchez, defendant was not considered a lower gang member, but the same as Sanchez, Ruelas and Azamar. Ruelas confirmed that defendant was "in there with, like the main heads of VFL, was [sic] me, Richie, and this dude named Sleepy [Azamar], VFL."

In mid–2007, VFL gang leader Victor Valencia shot a member of the "Richmond Sur Trece" (RST), a separate City of Richmond Sureno gang. Victor Valencia fled to Mexico and later died there. [FN 9] The VFL gang was in turmoil because there was no acknowledged leader and gang members feared retaliation from RST gang members. At this time Sanchez considered himself jumped out of the VFL gang and he was trying to lay low and stay away from the VFL gang. When Elizalde became the gang leader, he contacted Sanchez and told him he was still in the VFL gang. Elizalde told other gang members that they "needed to bring the gang back [and] ... put them on top." Elizalde's plan was to first recruit new people and then start taking them to the streets, "start being violent, shootouts, drive-bys," and attacking Norteno gang members, to improve the reputation of the VFL. Elizalde's plan to attack rival gang members, sell more drugs, and obtain more guns, was organized by a "little council" of five gang members: Sanchez, Azamar, Hernandez, Mota, and Ruelas, who were supposed to "run" their own people. At the same time, the VFL gang had a close relationship with the ML gang, an "upcoming" Sureno gang, but there was a split in the ML leadership and some of their members "were running with [VFL], when we went to do drive-bys or something like that they were with [the VFL]...."

[FN9. After gang members heard of Victor Valencia's death, a funeral for him was held in Richmond. The funeral service was attended by several alleged VFL gang members or associates including defendant, Sanchez, Elizalde, Molina, Romero, Azamar, Hernandez, Gomez, Mota, Avendano, Menendez, and Ruelas.]

Victor Cervantes testified he had previously been a member of the ML gang. In late 2007 and early 2008, after there was an internal split in the ML gang, Cervantes was accepted as an associate VFL gang member. Cervantes knew defendant, having seen him hanging around with VFL gang member Molina. According to Cervantes, in late 2007 and early 2008, the VFL and ML gangs were planning to come back up and get their names back up on the street and expand recruiting members by "just going to get most of the Nortenos out of Richmond and San Pablo by whooping them, making them get out of there. Killing them [or] whatever it takes to get them out of there."

**2. Murder of Luis Perez (Count 1)**

To demonstrate defendant's participation in the murder of Luis Perez, charged as a substantive offense (count 1) and an overt act of the conspiracy alleged in count 2, the prosecution presented the sworn testimony and out of court statements of Larry Valencia [FN 10] and Azamar [FN 11], as well as evidence of the police investigation of the murder.

[FN10. Larry Valencia testified under a grant of use immunity. He had initially been charged with murder but the charge was dropped. He had not received any consideration from the prosecution in return for his testimony, and he was not appearing in court as part of a plea bargain. The court advised the jury that it was taking judicial notice of the court's records that a preliminary hearing was held where Larry Valencia was charged with murder and at the conclusion of a preliminary examination the judge who heard the evidence did not hold him to answer on the charge of murder and the charge was dropped.]

[FN11. Azamar, an admitted VFL gang member, testified that in exchange for his testimony at defendant's trial, the prosecution agreed to reduce the charges against him from murder to accessory after the fact, and he was sentenced to a five year probationary term he was then serving.]

On the evening of February 16, 2008, defendant and five other alleged VFL members or associates (Mota, Azamar, Hernandez, Molina, Larry Valencia), were socializing at a house in North Richmond. They smoked marijuana and drank "booze,"

and defendant was also "popping pills," and was "hella fuckin' high." At the suggestion of defendant, the men drove to San Pablo in two cars; defendant and Molina were passengers in Mota's car and Larry Valencia and Hernandez were passengers in Azamar's car. At 2:15 a.m., Mota's car stopped near Luis Perez, who was standing on the street. Perez did not belong to a gang, but he was wearing a red sweatshirt. Exiting Mota's car, defendant told Perez, "show me your hands, you're all dressed in red." Perez responded by saying, "what the fuck," twice. Defendant fired seven shots at close range. Two shots entered the victim's back in a downward direction fatally wounding Perez. Defendant got back into Mota's car and all the men in the two cars went back to Richmond. Perez's neighbor and her boyfriend did not see who shot Perez; they heard the argument, followed by gunshots, and then the sound of cars driving away.

Larry Valencia testified he had never been a VFL gang member, but admitted he knew gang members including his cousin and defendant. In the past Larry Valencia had heard VFL gang members brag about beating up rival gang members and he knew the Broadway area of San Pablo was Norteno gang territory. Additionally, during a police search of Larry Valencia's home after the Perez murder, the police found gang indicia including blue bandanas, blue hats, music CD's with gang writing and photographs of persons making Sureno gang signs.

As to the circumstances of the Perez murder, Larry Valencia testified that on the night in question he was in the backseat of a car when he heard "gunshots." Larry Valencia did not actually see the face of the shooter, but he was sure defendant was the shooter because, unlike the other men in Mota's car, the shooter, like defendant, was short in stature, had long hair, and was wearing a hoody. Larry Valencia saw no gun, but he saw flames coming out of the gun that defendant "was holding up and shooting with." After the shooting Larry Valencia panicked; he had never seen "anything like this," and he did not know that anyone was carrying a gun that evening. As soon as the cars arrived back in Richmond, Larry Valencia got into his car and went home. The police arrested Larry Valencia on May 14, 2008. Larry Valencia told the police that defendant had shot the man wearing red. At a grand jury hearing and an earlier jury trial, Larry Valencia testified consistently with his statements to the police.

Azamar, an admitted VFL gang member, also testified as to circumstances of the Perez murder. On the night in question, Azamar and the other men with him including defendant were just driving around, hoping to find girls at a party. As Azamar sat in the driver's seat of his car, Azamar saw defendant get out of Mota's car and argue with Perez, who was wearing red. Acting totally surprised, Perez held up both arms, and Molina said, "Get him!" Defendant pulled a gun from his waist and fired at Perez. Perez fell at the first shot. Larry Valencia was screaming that he wanted to go home, and Azamar told him to "[s]top being a bitch." Azamar took Larry Valencia to his car and Larry Valencia drove away. Azamar denied knowing that any of the men had a gun that night and he did not expect to see

anyone get shot. Following his arrest, Azamar was placed in the jail's Q module with other VFL gang members. According to Azamar, while VFL gang members were housed in jail, defendant was "calling the shots, ... telling [Azamar] what to do in jail, ... [and] getting the kites [inner jail mail]." On one occasion Azamar got into a fight with defendant and Azamar lost. Later, Azamar made arrangements to talk with the police.

During the investigation of the Perez murder scene, the police found nine 9–millimeter Luger cartridge casings on the ground, mostly within three to five feet of Perez's body. The police also recovered a spent bullet with blood on top of the victim's red sweatshirt, which had been cut off by the paramedics and left at the scene.

### 3. Murder of Lisa Thayer (Count 6)

To demonstrate defendant's participation in the murder of Lisa Thayer, charged as a substantive offense (count 6) and an overt act of the conspiracy alleged in count 2, the prosecution's evidence consisted principally of the testimony of several witnesses who saw or heard shots fired but did not see the actual shooting or identify the shooter; audio recordings of three police interviews and portions of the trial testimony of Antonio S. (Antonio) [FN 12] elicited at an earlier VFL gang prosecution trial on November 15, 2010 [FN 13]; and the testimony of police officers who investigated the murder and a forensic pathologist.

[FN12. At defendant's trial, Antonio was called as a witness but he refused to testify even under a grant of use immunity. After a hearing, the court found Antonio in contempt of court and ordered him held in custody until the conclusion of the trial or he agreed to testify. Despite being given the opportunity to do so, Antonio never agreed to testify during the trial. The court ordered Antonio's release at the conclusion of the trial.]

[FN13. Defense counsel also read to the jury portions of Antonio's trial testimony elicited at the earlier VFL gang prosecution trial on November 15, 2010.]

On the afternoon of February 27, 2008, in San Pablo, several people witnessed a gun fight between several men in a van and a shooter on the street (the shooter) who was with two or three other men. The shooter, armed with a chrome, semi-automatic pistol, fired several shots in the direction of the men in a van. The shooter was not identified; he was described as approximately 18 or 19 years old, Hispanic or Mexican, approximately five foot seven, approximately 180 pounds, having long black hair worn in a ponytail. The men in the van drove away and the men on the street ran away. Lisa Thayer, who was not a member of a gang, was found nearby on the street. Based on the position of Thayer's body and the various

United States District Court
Northern District of California

descriptions of the shooting, the police believed that as the van drove away the shooter fired a 9–millimeter bullet, which missed the fleeing van and hit Thayer, fatally wounding her.

Immediately after Thayer was shot, San Pablo police officers received a dispatch reporting that a person had called saying that "some kids were shot at and then jumped ... [or] ran into this apartment complex." When law enforcement arrived at the apartment complex, the investigating police officers spoke with a witness, who had heard gunshots and fifteen minutes later, observed two young men running into the apartment complex. The witness further explained that the young men went to an apartment for a few minutes, and then fled toward the laundry room area of the apartment complex. As the police were interviewing the witness, they spotted two young men, matching the witness's descriptions, running in the apartment complex. The two young men, later identified as defendant and Antonio, were caught and arrested by the police officers. As the police secured defendant, he was asked if he had any items on his person and he produced a blue bandana. The police later searched defendant's home. In defendant's bedroom, the police found an empty case for .40 caliber handgun, an empty .40 caliber magazine, and a holster that would fit a 9–millimeter pistol, but no guns. The police also found gang drawings and gang graffiti on paper on which was written "Sur," which was an abbreviation for Sureno, and the number 13 in between a cross.

During the investigation of the Thayer murder scene, the police found nine 9–millimeter bullets within a ten-foot circle around Thayer's body. The location of the bullets was consistent with a person firing a weapon while standing in place, and not someone who was running and firing a weapon at the same time. The police also found .40 caliber shells and an unfired .38 caliber bullet in a cul-de-sac through which defendant and Antonio had run while fleeing from the men in the van. The gun that fired the bullet that killed Thayer was never recovered. However, a comparison of the 9–millimeter cartridge casings recovered from the Thayer and Perez murder scenes established that the casings were fired from the same 9–millimeter pistol.

Over the course of three interviews with the police, Antonio described the basic events of the day of the shooting. According to Antonio, defendant belonged to the VFL gang but Antonio did not. Antonio and defendant were walking on San Pablo Avenue near a liquor store when three men inside a burgundy van looked out and "mean mugged" them and then the van stopped. There were two Mexicans or Hispanics and an African–American man in the van. One of the men in the van got out and started shooting at Antonio and defendant. The man fired five or six shots as Antonio and defendant ran down the street passing a strip mall with a salon and toward an apartment complex. The van driver turned the van around and followed Antonio and defendant, and as defendant and Antonio jumped over a fence into an apartment complex, the men in the van began shooting at them again.

During the interviews with the police, Antonio was questioned about the individuals who fired shots during the

8

incident. During the first interview, Antonio claimed the men in the van fired on defendant and Antonio, and neither Antonio nor defendant fired back at any time. During the second interview, Antonio claimed the men in the van initially started shooting. Not knowing that defendant had a gun, Antonio was shocked when defendant pulled out a chrome gun and fired back five or six times at the men in the van. Antonio explained that during his initial interview he did not tell the police that defendant fired a gun because Antonio did not want to get defendant in trouble. When the men in the van shot at them a second time, defendant and Antonio were near an apartment complex and defendant did not shoot at the men in the van. During the third police interview, Antonio stated he did not know if defendant had fired his gun before or after the men in the van had first started shooting at them.

At an earlier VFL gang prosecution trial, Antonio testified that on the afternoon of the Thayer shooting, he and defendant went to a store on San Pablo Avenue to pick up Antonio's gold-tooth dental grill. The men left the shop and as they were walking on the sidewalk, a van passed the men and pulled over and stopped. The men in the van "mugged" Antonio and defendant. Antonio and defendant kept on walking and after that Antonio heard gunshots, which Antonio guessed were fired by the men in the van. After the shots were fired, Antonio and defendant ran between a construction site, ended up at a dead end street, and jumped over a fence into an apartment complex. As Antonio and defendant jumped the fence, the van came around the corner and the men in the van started shooting again but did not hit Antonio or defendant. Once Antonio and defendant got to the apartment complex, they sat on the stairs and did not go into anyone's house. When the police came, Antonio and defendant left the apartment complex and the police chased after them. Antonio further testified that after the police discussed with him the concept of self-defense, he made up a story about defendant firing his gun because he believed he was helping defendant make it look like self defense. However, Antonio did not realize that "the whole time" he was incriminating defendant.

On April 24, 2008, the police received information about defendant's involvement in the Thayer shooting from Ruelas, who was then acting as a police informant. According to Ruelas, defendant told him that on the day in question he had two guns. Defendant had gone to get his gold-tooth dental grill, and when he came out of the store, defendant saw "the Nortenos on the corner or something." Defendant "started talking shit to 'em. They didn't say nothing. He said, 'Man, these mother fuckers some suckers.' [Defendant] pulled out the guns. He said he started shooting at 'em. And he started running. And there was some black dude wit' him." Defendant also said he gave his guns to "some dude name Nacho," who was a ML gang member. When asked why defendant would give a gun to a ML gang member, Ruelas replied that the MLs wanted to run with the VFL. Defendant told Nacho to sell the guns, but Ruelas did not know if Nacho had sold the guns. [FN 14]

9

[FN14.   During cross-examination at his conditional examination, Ruelas testified he had told the grand jury that he had talked to defendant about "a murder charge" defendant "was facing" [the Thayer incident], and defendant had said "that he was shooting back at some dudes because the dudes were shooting back at him," and defendant did not know that he had shot a lady until afterwards when the cops told him. However, on redirect examination, Ruelas said that "[e]verybody knew th[e] story" that he had told the police about defendant's involvement in the Thayer shooting, and Ruelas asserted he had made up the story and had never spoken with the defendant about any murder.]

### 4. Murder of Rico McIntosh (Count 5)

To demonstrate defendant's participation as a co-conspirator [FN 15] in the murder of Rico McIntosh, charged as a substantive offense (count 5) and an overt act of the conspiracy as alleged in count 2, the prosecution's evidence consisted of the testimony of Oscar Menendez [FN 16], as well as evidence acquired during the police investigation of the murder.

[FN15.   On February 27, 2008, defendant was arrested for the Thayer murder. He was still in custody on the day of the McIntosh murder.]

[FN16.   Menendez testified he had pleaded guilty to being an accessory after the fact to the murder of McIntosh with a related gang enhancement, he agreed to spend time in county jail, and he received some assistance with his immigration issues. He had also agreed to testify truthfully if called to testify as a witness in defendant's trial.]

Menendez testified he became involved with VFL gang members when he was 21 years old. He attended parties at the invitation of the VFL gang members, and there were some parties attended by people from other gangs, including the MLs. Menendez explained his understanding of the activities of a gang member. On one occasion defendant told him that to gain respect from the gang, a member had to commit a certain number of crimes and keep the Nortenos "on check so they can respect you," which meant to beat them up. Menendez knew the Surenos were rivals of the Nortenos, and that the Nortenos' territory was San Pablo especially on Broadway and Montalvin. He understood that when you were in the gang, you were supposed to hunt Nortenos in the Broadway area of San Pablo. Menendez also understood that every time a VFL gang member saw a Norteno out of Richmond he was to "[b]eat him up" "[a]nd if you had a gun use that against them."

On the night of the McIntosh shooting, Mota and Gomez picked up Menendez to "hang out" together. Mota was driving

his new black car, Gomez sat in the front passenger seat and Menendez sat in the back seat. The men were supposed to go to McDonald's, but instead of making a right turn, Mota made a left turn heading toward Broadway in San Pablo. As Mota was driving, the men saw McIntosh walking on the sidewalk closest to the passenger side of the car; McIntosh was wearing "kind of some red," the color claimed by Nortenos. Gomez said to the men in the car that he had observed McIntosh coming from a party being held at a Norteno house. Mota and Gomez rolled down the car windows and asked McIntosh if he was a buster. McIntosh said, "What the fuck is a buster?" Mota then said, "Yeah, he is," and Gomez pulled out a gun and shot McIntosh about five times. According to Menendez, McIntosh was "a white guy" and did not look like a Norteno gang member. After the shooting Mota and Gomez asked Menendez why he was so scared, and Menendez said he wanted to go home. The men dropped Menendez at his home; they were acting happy and making fun of Menendez.

Menendez denied that he, Mota, and Gomez, had ever been out looking for people to shoot before the night of the McIntosh shooting. On the night of the McIntosh murder Menendez did not know that Gomez was armed until he pulled out a gun and shot McIntosh. [FN 17] After the McIntosh shooting, Gomez asked Menendez to hold the gun because Gomez was on parole. Menendez said, "No," but when the men dropped Menendez at his home they just left the gun and Menendez took the gun and hid it in a cabinet in his room. During a later search of Menendez's house, the police found a .25–caliber semi-automatic inside a cabinet. A ballistics analysis showed that the shell casings found at the scene of the McIntosh shooting were fired from the gun recovered from Menendez's residence. The police found no evidence that McIntosh was a gang member.

[FN17. Menendez testified he had previously found the gun and gave it to Mota because Ruelas said he (Menendez) did not know how to use a gun. On the night of the McIntosh murder, Mota gave the gun to Gomez who used it to shoot McIntosh.]

After his arrest Menendez was placed in a jail module with VFL gang members including defendant and Molina. In jail, Menendez was informed that there were certain rules that VFL gang members had to follow while in jail. [FN 18] Both Molina and defendant asked Menendez to turn over his paperwork (police report of his arrest) but Menendez could not do so because his father had the document. The day he was asked for his paperwork Menendez was beaten by defendant and another VFL gang member while the men were returning to their module after a free period. Menendez was then placed in protective custody.

[FN18. Sanchez explained that it was common for gang members to look over "paperwork," i.e.

police reports of gang members, to ascertain whether the gang members were cooperating with the police.]

San Pablo Police Detective Robert Brady confirmed that on the day McIntosh was killed, Ruelas was working as a confidential informant for the police. Ruelas told Brady that Mota, Gomez, and Menendez, were driving around the San Pablo area, specifically the Broadway area and several other areas, hunting for Nortenos, they found a subject, and they shot him. After the McIntosh murder, Brady participated in a search of Gomez's home. Inside Gomez's room, the police located several CDs and CD cases with Sureno gang references written on them, a few notebooks with rap lyrics written inside, and a couple of blue bandanas. One of the CDs had written on it the monikers of certain gang members and "VFLs, MLs."

**B. Defense Case**

Defendant called as a witness gang expert Martin Sanchez–Jankowski, who identified three models of criminal street gang structures. The witness testified that Mexican–American street gangs typically fit into the "influential model," where charismatic members within the structure are respected leaders. The witness further testified that gangs generally are hierarchical and the notion that gangs are "loose associations with little in the way of a cohesive leadership structure is simply not accurate." The witness confirmed that collective or organized attacks on rival gangs helped build cohesion, tended to increase gang membership by improving the gang's reputation, and was a method by which a gang rebuilt itself. Individual gang members gained status and moved up the organization by committing violent acts. However, there was "a difference between violence, committed by a gang member that could be committed any time, at any place, and gang violence which was an organizational violence that was directed by the leadership of the organization for the benefit of the organization." The looser the structure of the gang, the more likely that violence would be the independent act of individual gang members.

Defendant's sister testified that defendant had been kicked out of the family residence when he was 15 years old because he was too rebellious. The witness thought that defendant's father was too strict with defendant. Defendant hung around with cousins who were gang members and got into trouble. However, the witness did not believe defendant was in a gang; he never carried a blue rag and he never possessed a gun.

**C. Prosecution's Rebuttal**

The prosecution recalled Detective Brady, qualified as an expert on the Norteno and Sureno gangs, who testified about the history of the Sureno gang and its common signs and symbols, and that the VFL and ML were gang subsets of the Sureno criminal street gang. Brady opined defendant was a member of the VFL gang for the following reasons: (1) defendant self-admitted to investigators during this case to being a VFL gang

member; (2) defendant was carrying a blue bandana in his pocket at the time he was arrested; (3) defendant was identified as a gang member by VFL informants; and (4) defendant had "[g]one into classifications, identified himself as being a VFL." Detective Brady also opined that Sanchez, Menendez, Azamar, and Ruelas, were VFL gang members; Larry Valencia was a VFL gang "associate," and Cervantes was a ML gang member. Based on hypotheticals of the circumstances of the Perez, Thayer, and McIntosh murders, Detective Brady opined that such offenses were committed for the benefit of, in furtherance of, and in association with the VFL gang.

**D. Jury Verdicts**

Defendant was convicted of the following substantive crimes with true findings made on the sentence enhancements: (1) the first-degree murder of Luis Perez, with related gang, firearm, and multiple-murder special circumstances allegations (count 1); (2) the first-degree murder of Lisa Thayer, with related gang, firearm, and multiple-murder special circumstances allegation (count 6); (3) first-degree murder of Rico McIntosh, with a related gang allegation (count 5); (4) conspiracy to commit murder and assault with a deadly weapon, with a related gang allegation (count 2); and (5) participation in a criminal street gang (count 3).

Camacho, 2016 WL 3680119, at *1-8.

## III. DISCUSSION

### A. **Legal Standard**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

13

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, as noted above, the California Supreme Court summarily denied Petitioner's petitions for review. See supra at 2; (Exs. 15, 16). The California Court of Appeal, on direct review, addressed all the claims in the instant petition. (Ex. 13.) The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and

it is that decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B**.    **Claims and Analysis**

Petitioner raises the following grounds for federal habeas relief:

(1) his right to due process was violated because one of the counts of murder rested on a theory of vicarious liability not permitted under California law;

(2) his convictions for one of the murders, for conspiracy to commit murder, and for participation in a street gang violated his right to due process because they were based on uncorroborated testimony of co-conspirators;

(3) his convictions for one of the murders violated his right to due process because there was insufficient evidence that the murder was committed in furtherance of or as a reasonable and probable consequence of the conspiracy;

(4) the trial court violated his right to due process by admitting testimony about his participation in gang crimes;

(5) the trial court violated his right to due process by allowing the jury to use his prior arrest on gun charges to convict him of conspiracy;

(6) admission of his statement to a jail officer violated his privilege against self-incrimination and his lawyer's failure to object to the evidence violated his right to the

15

effective assistance of counsel;

(7) instructions to the jury not to speculate why accomplices were not being prosecuted violated his rights to confrontation and due process;

(8) prosecutorial misconduct violated his right to due process and his lawyer's failure to object to the misconduct violated his right to the effective assistance of counsel; and

(9) his sentence violated his right to be free from cruel and unusual punishment. (Pet. at 10-46.) Because Claims 6 and 8 challenge both an event in the underlying criminal trial and defense counsel's failure to object to that event, the Court will discuss these arguments as Claim 6A (the admission of the statement), Claim 6B (counsel's failure to object), Claim 8A (the prosecutor's conduct), and Claim 8B (counsel's failure to object to the prosecutor's conduct).

Respondent argues that Claim 1 is not cognizable because it is based on state law. Respondent argues that Claims 2, 4, 5, 6A, 7, and 8A have been procedurally defaulted. For the sake of efficiency, the Court will address these procedural arguments before considering the merits of petitioner's claims.

## 1. **Non-Cognizable Claim**

Respondent argues that Claim 1 is not cognizable because it is based on state, rather than federal, law. (See Ans. at 15-21.)

In Claim 1, Petitioner argues his conviction for the murder of Rico McIntosh is premised "on a legally erroneous theory of vicarious liability," because "conspiracy is not a valid theory of criminal liability under California law." (Pet. at 10.) Petitioner argues that, although California courts have recognized conspiracy as a theory of criminal liability, the legislature has not and so Petitioner's conviction is invalid. (See id. at 11.)

The state appellate court rejected this argument on direct appeal:

> We also reject defendant's argument that the trial court violated his due process rights by allowing the jury to convict him of the McIntosh murder based on "an invalid conspiracy theory of vicarious liability." According to defendant, California law does

16

not allow for conspiracy as a valid theory of vicarious criminal liability. However, he concedes our Supreme Court has consistently rejected his argument, and upheld convictions based on a defendant's vicarious liability for the acts of a co-conspirator. (See *People v. Valdez* (2012) 55 Cal.4th 82, 149–150 (*Valdez*), and the cases cited therein; see also *People v. Maciel* (2013) 57 Cal.4th 482, 515 (*Maciel*); *People v. Lopez* (2013) 56 Cal.4th 1028, 1071, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1215–1216.) We see no reason to further address defendant's contention, especially in light of the fact that we are bound by the decisions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).

Camacho, 2016 WL 3680119, at *11.

Respondent notes that the state appellate court considered only California law when it rejected Petitioner's, and argues that "[t]his claim is not cognizable because federal habeas relief is available only to state prisoners who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" (Ans. at 20 (citation omitted).) Respondent is correct on both fronts. The Supreme Court has repeatedly held that the federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982); Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994); see, e.g., Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief); Moore v. Rowland, 367 F.3d 1199, 1200 (9th Cir. 2004) (per curiam) (state's violation of its separation-of-powers principles does not give rise to a federal due process violation); Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law and not an element of the crime for jury determination is not open to challenge on federal habeas review); Franklin v. Henry, 122 F.3d 1270, 1272-73 (9th Cir. 1997) (court was bound by state court finding that a violation of state law had occurred, but still had to consider whether the violation amounted to a federal constitutional error). Because Petitioner's first claim is based purely on state law of which the interpretation or application is not cognizable in federal habeas, see

Swarthout, 131 S. Ct. at 861-62; Estelle, 502 U.S. at 67-68, it is not cognizable.

**2.     Procedurally Defaulted Claims**

Respondent argues that Claims 2, 4, 5, 6A, 7, and 8A have been procedurally defaulted because Petitioner did not object in the trial court.  (See generally, Ans.)  A review of the record reveals that Petitioner, in fact, failed to object at trial.  (See generally, Ex. 13 ("Transcript").)  The state appellate court found the failure to object dispositive of Claims 2, 4, 5, 6A, 7, and 8A.  See generally, Camacho, 2016 WL 3680119.  Accordingly, these claims were procedurally defaulted.

### a.  The state appellate court's findings

In Claim 2, Petitioner argues that his convictions "based on conspiracy depend on uncorroborated accomplice testimony" and that this violates his due process.  (Pet. at 15.)  The state appellate court concluded that Petitioner's claim was "both forfeited and unavailing."  Camacho, 2016 WL 3680119, at *8.  The state appellate court explained that "[s]ome of the CALJIC accomplice instructions ultimately given to the jury were listed among defense counsel's proposed jury instructions," and "defense counsel lodged no objection to the court's accomplice instructions proposed and ultimately given to the jury."  Id.  Because Petitioner's defense counsel did not object to these instructions at trial, the state appellate court concluded that this claim was forfeited.  See id.

In Claim 4, Petitioner argues that statements regarding Petitioner's "participation in VFL crimes" were admitted in violation of Petitioner's Fifth and Fourteenth Amendment rights.  (Pet. at 24.)  The state appellate court concluded there was no error on the part of the trial court, because "defense counsel should have made a specific objection," but "failed to make an appropriate objection."  Camacho, 2016 WL 3680119, at *12.

In Claim 5, Petitioner argues that the trial court "erred by letting the jury use [Petitioner's] 2006 arrest for gun possession" as evidence of his participation in the conspiracy, and that this error violates Petitioner's Fifth and Fourteenth Amendment rights.  (Pet. at 28.)  The state appellate court "conclude[d] defendant's claim of error is

forfeited as he made no objection to the trial court's ruling on the two grounds he now asserts on appeal." <u>Camacho</u>, 2016 WL 3680119, at *13.

In <u>Claim 6A</u>, Petitioner argues that his right against self-incrimination was violated by the admission of his "acknowledgment of [gang] membership to a jail intake officer." (Pet. at 33.) The state appellate court noted that defense counsel "failed to object to the admission of any portion of" the intake officer's testimony. <u>Camacho</u>, 2016 WL 3680119, at *14.

In <u>Claim 7</u>, Petitioner argues that the trial court erred in giving the jury instruction CALJIC 2.11.5, which "directed the jury not to speculate why [certain] accomplice-informants were not being prosecuted." (Pet. at 37.) The state appellate court "conclude[d] defendant ha[d] forfeited appellate review" because "[a]t no time did defense counsel object to the use of" that jury instruction. <u>Camacho</u>, 2016 WL 3680119, at *15.

In <u>Claim 8A</u>, Petitioner argues that the prosecutor engaged in misconduct during Petitioner's criminal trial, in that the prosecutor attacked defense counsel's integrity, and that this misconduct violated Petitioner's right to due process. (<u>See</u> Pet. at 41.) The state appellate court "conclude[d] the argument [was] not preserved for appellate review," and that "defendant ha[d] forfeited his claim of error as he did not object or request an admonition in the trial court." <u>Camacho</u>, 2016 WL 3680119, at *16, 17.

Thus, the state appellate court reached particularized, record-based findings that petitioner failed to object as to Claims 2, 4, 5, 6A, 7, and 8A.

**b. Analysis**

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991). In the context of direct review by the United States Supreme Court, the "adequate and independent state ground" doctrine goes to jurisdiction; in federal habeas cases, in whatever court, it is a matter of comity and federalism. <u>Id.</u> The procedural default rule is

United States District Court
Northern District of California

1   a specific instance of the more general "adequate and independent state grounds" doctrine.

2   Wells v. Maass, 28 F.3d 1005, 1008 (9th Cir. 1994).  In cases in which a state prisoner has

3   defaulted his federal claims in state court pursuant to an independent and adequate state

4   procedural rule, federal habeas review of the claims is barred unless the prisoner can

5   demonstrate cause for the default and actual prejudice as a result of the alleged violation of

6   federal law, or demonstrate that failure to consider the claims will result in a fundamental

7   miscarriage of justice.  Coleman, 501 U.S. at 750.

8          Here, the state appellate court rejected Claims 2, 4, 5, 6A, 7, and 8A because

9   Petitioner did not make the necessary objections in trial court.  See Camacho, 2016 WL

10  3680119, at *8-17.  The Ninth Circuit has specifically held that failure to comply with the

11  California contemporaneous objection rule results in a procedural default.  See Fairbank v.

12  Ayers, 650 F.3d 1243, 1256-57 (9th Cir. 2011); Rich v. Calderon, 187 F.3d 1064, 1069-70

13  (9th Cir. 1999).  Moreover, the Ninth Circuit has applied California's contemporaneous

14  objection rule in affirming denial of a federal petition on grounds of procedural default

15  where there was a complete failure to object at trial.  See Inthavong v. Lamarque, 420 F.3d

16  1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004);

17  Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).  Accordingly, this Court cannot

18  reach the merits of Claims 2, 4, 5, 6A, 7, and 8A because those claims were procedurally

19  defaulted.  See Coleman, 501 U.S. at 729-30.

20

21         There is an exception to procedural default, which applies when a petitioner shows

22  "cause" for the failure to comply with the state procedural rule and "prejudice" arising

23  from the default, or that the failure to consider the claim will result in a fundamental

24  miscarriage of justice.  Coleman, 501 U.S. at 750.  To establish cause, a petitioner must

25  show that "some objective factor external to the defense impeded counsel's efforts to

26  comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986). To

27  establish a "fundamental miscarriage of justice," a petitioner must demonstrate "a

28

20

constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Wood v. Ryan</u>, 693 F.3d 1104, 1117-18 (9th Cir. 2012) (internal quotation omitted). A claim of actual innocence is rarely met and must be based on reliable evidence not presented at trial. <u>Casey v. Moore</u>, 386 F.3d 896, 921 n.27 (9th Cir. 2004).

### 1. Petitioner did not raise cause as to Claims 2, 4, 6, and 7.

As to Claims 2, 4, 5, and 7, Petitioner has not made any showing of cause.[2] The Petition makes no mention of <u>why</u> defense counsel failed to object to the events of which Claims 2, 4, 5, and 7 complain.[3] (<u>See generally</u>, Pet.) Such an explanation is the <u>sine qua non</u> of a cause showing. <u>See Carrier</u>, 477 U.S. at 488 (requiring a petitioner to identify some "objective factor external to the defense"); <u>see also Buffalo v. Sunn</u>, 854 F.2d 1158, 1163-64 (9th Cir. 1988) (lockdown by prison officials established cause); <u>Frost v. Gilbert</u>, 835 F.3d 883, 889 (9th Cir. 2016) (en banc) (cause for failing to raise <u>Brady</u> and <u>Napue</u> violations existed when prosecution suppressed exculpatory evidence). Nor did the Petition argue that Petitioner was factually innocent (<u>see generally</u>, Pet.), as is required to establish that a fundamental miscarriage of justice will occur, <u>see Wood v. Ryan</u>, 693 F.3d at 1117-18. As Petitioner failed to file a Traverse, despite being given three extensions of time to do so, he likewise did not establish cause or a miscarriage of justice in such a document.

The Ninth Circuit has recognized that the petitioner bears the burden of establishing cause and prejudice, or a fundamental miscarriage of justice. <u>See Madrid v. Gregoire</u>, 187 F.3d 648 (9th Cir. 1999) (finding petitioner had not borne his burden of establishing cause); <u>Woolery v. Arave</u>, 8 F.3d 1325, 1331 (9th Cir. 1993) ("the burden of showing 'cause and prejudice' is on the petitioner"); <u>Blumberg v. Cal. Med. Facility</u>, 967 F.2d 584 (9th Cir. 1992) ("The burden is on the petitioner to show cause and prejudice."). Because

---

[2] If insufficient cause is shown, a court need not reach the prejudice question. <u>Smith v. Baldwin</u>, 510 F.3d 1127, 1147 (9th Cir. 2007).

[3] Petitioner argues that Claims 6A and 8A were the result of ineffective assistance of counsel. These arguments fail for the reasons stated <u>infra</u>.

United States District Court
Northern District of California

Petitioner did not even attempt to carry this burden as to Claims 2, 4, 5, and 7, these claims have been procedurally defaulted.

### 2. Petitioner raised, but did not establish, cause as to Claims 6A and 8A.

As to Claim 6A, Petitioner argues that his counsel provided ineffective assistance by failing to object to the admission of Petitioner's statement that he was a Sureño. (See Pet. at 27-30.) To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. Loveland v. Hatcher, 231 F.3d 640, 644 (9th Cir. 2000) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

Petitioner raised this ineffective assistance argument to the state appellate court, and "argue[d] that his claim of error is cognizable on direct appeal because there can be no valid strategic reason why counsel would not have objected to the evidence." Camacho, 2016 WL 3680119, at *14. The state appellate court concluded that, even assuming the admission of Petitioner's statement was erroneous, "there was no prejudicial error" because "defendant's 'gang affiliation was amply established by independent and uncontradicted evidence.'" Id. at *15. Specifically, the state appellate court noted that Petitioner's VFL membership was established by the testimony of four other VFL members, as well as by expert testimony, and the fact that Petitioner possessed "gang drawings and graffiti and notebooks with the notations of "Sur" and "13.'" Id. As discussed more fully below, see Section III.B.4.a, the Court agrees with the state appellate court that this evidence was sufficient to establish Petitioner's VFL membership even without admission of Petitioner's statement, and so Petitioner has not shown he was prejudiced by counsel's failure to object.

As to Claim 8A, Petitioner argues the failure to object was caused by ineffective assistance of counsel. (See Pet. at 42 ("Appellant would respectfully like to add to this

claim that trial defense counsel rendered ineffective assistance by failing to object . . . .").) Petitioner did not raise this argument to the state appellate court. (See Ex. 6 at 97-99 (opening brief, not arguing that trial counsel should have objected to the prosecutor's alleged misconduct); see generally Exs. 8 and 9 (reply brief and supplemental opening brief, failing to argue about prosecutorial misconduct at all).) To serve as "cause," the claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts. See Carrier, 477 U.S. at 489. Here, because Petitioner failed to argue to the state appellate court that his trial counsel was ineffective in not objecting to the prosecutor's misconduct, Petitioner has failed to establish cause as to Claim 8A.

Because Respondent has shown that Claims 2, 4, 5, 6A, 7, and 8A were procedurally defaulted, and because Petitioner fails to establish cause and prejudice for his procedural default, this Court cannot reach the merits of those claims.

### 3. Sufficiency of Evidence Claim

In Claim 3, Petitioner argues there was insufficient evidence to support his conviction for the murder of Rico McIntosh. Petitioner argues that the murder of Rico McIntosh was not "a reasonably foreseeable consequence" of the VFL conspiracy, and disputes the geographic breadth with which the VFL conspiracy was defined. (See Pet. at 21-23.) Petitioner contends that the VFL conspiracy only reached the city of Richmond, and so crimes committed in the city of San Pablo were not a reasonably foreseeable consequence of the conspiracy. (See id. at 21.) He argues that the shooting of Rico McIntosh in San Pablo was an "independent, spontaneous act," for which he should not be vicariously liable. (Id. at 23.)

On direct appeal, the state appellate court rejected Petitioner's claim:

> Defendant also argues his conviction for the McIntosh murder should be reversed because that murder was not committed in furtherance of the conspiracy alleged in count 2. Relying on isolated portions of the trial evidence and the prosecutor's closing remarks, defendant specifically contends the scope of the conspiracy as alleged in count 2 was "never more" than an agreement by VFL gang members to "take back the hood" by committing crimes against rival Nortenos in

23

Richmond only, and therefore, the alleged conspiracy did not encompass the McIntosh murder, which took place in San Pablo. However, consistent with the evidence provided by Sanchez and Cervantes, [FN 20] the jury reasonably could find that the scope of the conspiracy to "take back the hood" in late 2007 and early 2008 was an agreement among VFL gang members to regain street respect for the gang by the commission of violent acts in the area claimed as Sureno territory within Richmond and the shooting and beating of rival Norteno gang members in Richmond as well as their claimed gang territory of San Pablo. The portions of the evidence mentioned by defendant in support of his appellate argument were "submitted to the jury [and] w[ere] apparently disbelieved by them. The jurors were entitled to base their verdict upon the reasonable inferences to be drawn from the testimony offered by the prosecution and were not bound to accept the evidence [relied on] by the defense in opposition to such inferences." (*People v. Thomas* (1933) 135 Cal.App. 654, 659 (*Thomas* ).) Additionally, the prosecutor, in his closing remarks, did not limit the scope of the conspiracy to "an agreement to 'take back the hood' in *Richmond* from rival Nortenos," as defendant argues. Instead, the prosecutor expressly urged the jury to consider the charge of conspiracy as alleged in count 2 in the following manner: "So let's talk about why the defendant is guilty of conspiracy.... The adoption by a person of the criminal design and criminal intent entertained in common by others, and of its object and purposes, is all that is necessary to make that person a co-conspirator. [¶] So, ... [O]bviously, there is no direct evidence that the defendant sat down with Gama or somebody else and said, hey, what are we doing, oh, we are bringing the hood back. What does that mean, we are going to attack rivals. There is none of that. [¶] ... [¶] *The defendant on February 16th, 2008, clearly showed that he had adopted the design of the conspiracy. He went hunting in rival gang territory. And he killed Luis Perez. Just according to the plan of the conspiracy, which is to attack rival gang members in their territory.* [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. [¶] ... [O]nce you decide that a defendant is a conspirator, his fellow co-conspirators, all of these guys, their acts, ... the acts of Scrappy, Gomez, Mota when they killed Rico McIntosh, despite the fact that the defendant wasn't there, those are his acts, because they have occurred in furtherance of the common design of the conspiracy. [¶] It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation of a conspiracy may be inferred from all circumstances tending to show the common intent, either by direct or circumstantial evidence." (Italics added.)

[FN20: According to Sanchez, when Elizalde became the VFL gang leader, Elizalde contacted Sanchez and told him he was still in the VFL gang. Elizalde told other gang members that they "needed to bring the gang back [and] ... put them [on] top." Elizalde's plan was to first recruit new

United States District Court
Northern District of California

people and then start taking them to the streets, "start being violent, shootouts, drive-bys," and attacking Norteno gang members, to improve the reputation of the VFL. According to Cervantes, in late 2007 and early 2008, the VFL and ML gangs were planning to come back up and get their names back up on the street and expand recruiting members by "just going to get most of the Nortenos out of Richmond and San Pablo by whooping them, making them get out of there. Killing them [or] whatever it takes to get them out of there."]

Nor do we see any merit to defendant's contention that his conviction for the McIntosh murder should be reversed because that murder was not a reasonably foreseeable consequence of the conspiracy alleged in count 2. Again relying on isolated portions of the trial testimony, defendant contends the McIntosh murder, committed while he was incarcerated, was an independent spur of the moment act committed by Mota, an alleged member of the VFL gang, and Gomez, the actual shooter, who was a member of the ML gang, and not a VFL gang member. However, both Mota and Gomez were named as alleged co-conspirators in the indictment filed against defendant. At the time of the conspiracy alleged in count 2, the VFL gang had a close relationship with the ML gang, an "upcoming" Sureno gang, but there was a split in the ML leadership, and, therefore, according to Sanchez, some of the ML gang members "were running with [VFL], when we went to do drive-bys or something like that they were with [the VFL].... Sanchez further claimed that Gomez "put in work" for the VFL gang and "should have been a VFL" gang member. Consequently, the jury reasonably could find that Gomez was a member of the ML gang but sufficiently identified as a member of the VFL gang so as to be considered a VFL gang member and a member of the conspiracy alleged in count 2. The portions of the evidence mentioned by defendant in support of his appellate argument were "submitted to the jury [and] w[ere] apparently disbelieved by them. The jurors were entitled to base their verdict upon the reasonable inferences to be drawn from the testimony offered by the prosecution and were not bound to accept the evidence [relied on] by the defense in opposition to such inferences." (*Thomas, supra,* 135 Cal.App. at p. 659.) Additionally, the trial court explicitly and appropriately advised the jurors that they were to decide the scope of the conspiracy and the duration and the goals of the conspiracy. "[H]ow far the subsequent conduct of defendant[ ] went to establish a conspiracy, and to what extent [he was] involved in it, whe[re and when] that conspiracy had its origin ...; whether the crime alleged was committed in pursuance of the conspiracy found to have been formed, or was the act of some of the persons present, done 'as a fresh and independent product of the minds of some of them, and outside of and foreign to the common design,' were questions exclusively with the jury." (*People v. Holmes* (1897) 118 Cal. 444, 457.)

, 2016 WL 3680119, at \*10–11.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, see id. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of Jackson when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993); see, e.g., Coleman, 566 U.S. at 656 ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). Instead, the federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

After AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference. See Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision

reflected an unreasonable application of <u>Jackson</u> to the facts of the case. <u>Coleman</u>, 566 U.S. at 651; <u>Juan H.</u>, 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)). Thus, if the state court affirms a conviction under <u>Jackson</u>, the federal court must apply § 2254(d)(1) and decide whether the state court's application of <u>Jackson</u> was objectively unreasonable. <u>See</u> <u>McDaniel v. Brown</u>, 558 U.S. 120, 132-33 (2010); <u>Sarausad v. Porter</u>, 479 F.3d 671, 677-78 (9th Cir. 2007). To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." <u>Boyer v. Belleque</u>, 659 F.3d 957, 964-965 (9th Cir. 2011).

Here, the Court cannot conclude that the state appellate court's determination "was objectively unreasonable." As Respondent argues, "[t]here was ample evidence that the VFL gang committed assaults outside of Richmond in order to gain respect and promote the gang." (Ans. at 19.) First, at least three VFL members testified that leader "Gama" wanted to "bring the gang back" by, among other things, "being violent, shootouts, drive-bys, beating you up, whatever." (Tr. at 1316:8-21, 1427:22-25 (Sanchez), 1946:3-10 (Azamar).) Specifically, VFL was to "bring the hood back" by "shooting and beat[ing]" members of the rival Norteños gang. (<u>Id</u>. at 1326:14-23 (Sanchez), 1946:3-10 (Azamar, explaining that VFL would "bring the hood back" by engaging in violence against Norteños), 3525:5-19 (Ruelas, explaining that VFL members would "drive around . . . Pablo and stuff like that, just go looking for people to kill").) These VFL members also testified that VFL members went to San Pablo specifically to look for Norteños and, when they found Norteños, attacked them. (<u>Id</u>. at 1281:9-1283:26, 1311:16-1312:18, 1438:11-27.) In fact, as part of the conspiracy, Petitioner went to San Pablo and shot Luis Perez, because Luiz Perez was dressed in red, the color of the Norteños. <u>See Camacho</u>, 2016 WL 3680119, at *3. In light of testimony from other VFL members that the conspiracy extended to hunting and killing Norteños in San Pablo, and the fact that Petitioner went to

San Pablo and shot someone he believed to be a Norteño, it was not "objectively unreasonable" for the state appellate court to conclude that a rational jury could have found the conspiracy extended to San Pablo. Accordingly, there was sufficient evidence of guilt.

Accordingly, Petitioner is not entitled to relief on Claim 3.

### 4.    <u>Ineffective Assistance Claims</u>

Petitioner's Claim 6 complains of the admission of Petitioner's statement to a jail officer, and his Claim 8 complains of prosecutorial misconduct. As part of Claims 6 and 8, Petitioner argues that his trial counsel provided ineffective assistance by failing to object to the admission and misconduct, respectively. (<u>See</u> Pet. at 33-36, 42.) As noted, <u>supra</u>, the Court will refer to the ineffective assistance claims as Claim 6B and Claim 8B.

Claims 6B and 8B are without merit. In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. <u>Id.</u> at 697.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. <u>See</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1410-11 (2011); <u>Harrington v. Richter</u>, 131 S. Ct. 770, 788 (2011) (same); <u>Premo v. Moore</u>, 131 S. Ct. 733, 740 (2011) (same). The general rule of <u>Strickland</u>, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." <u>Cheney v. Washington</u>, 614 F.3d 987,

28

995 (9th Cir. 2010) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). When §

2254(d) applies, "the question is not whether counsel's actions were reasonable. The

question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s

deferential standard." <u>Harrington</u>, 131 S. Ct. at 788.

### a. Claim 6B

Petitioner argues that his trial counsel erred in failing to object to the admission of

Petitioner's statement to a jail officer, that Petitioner was a member of VFL. (<u>See</u> Pet. at

33-36.) The state appellate court considered and rejected this argument:

> On appeal, defendant argues the trial court erred in admitting Deputy Sheriff Trindade's testimony because there was no evidence that defendant was given *Miranda* warnings before the officer questioned defendant about his gang affiliation. Defendant concedes his trial counsel did not object to Deputy Sheriff Trindade's testimony, but argues that his claim of error is cognizable on direct appeal because there can be no valid strategic reason why counsel would not have objected to the evidence. He further asserts his trial counsel's failure to object was prejudicial because his admission of gang membership "was certainly the prosecution's strongest evidence on the issue, and thoroughly disabled the defense from making any argument to the contrary." According to defendant, had the evidence been objected to and excluded, there is a reasonable probability that at least some of the jury's findings in this case would have been different and more favorable to him. We conclude defendant's arguments are unavailing.
>
> As defendant concedes, his trial counsel failed to object to the admission of any portion of Deputy Sheriff Trindade's testimony. Consequently, we do not know what the witness would have said had he been asked if defendant had been informed and waived his *Miranda* rights before responding to the question about gang affiliation. Because the record does not show whether or not defendant was advised of his *Miranda* rights before he admitted being a Sureno gang member, defendant's claim of ineffective assistance of counsel cannot be resolved on this appeal. As an appellate court we cannot declare that Deputy Sheriff Trindade acted improperly when he questioned defendant, find that it was error for the trial court to admit the evidence, "and brand a defense attorney incompetent unless [we] can be truly confident all the relevant facts have been developed and [Deputy Sheriff Trindade] and [the] prosecution had a full opportunity to defend the admissibility of the evidence." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.) " 'When ... the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons.... Because the appellate record ... does not show the reasons for

defense counsel's actions or omissions, a claim of ineffective assistance of counsel should ... be made in a petition for writ of habeas corpus, not on appeal.' (*People v. Diaz* (1992) 3 Cal.4th 495, 557, 558.)" (*People v. Lucero* (2000) 23 Cal.4th 692, 728–729.) Even if Deputy Sheriff Trindade's testimony of defendant's admission of gang membership was elicited in violation of *Miranda,* as we more fully explain below, we would conclude on this record that defendant has failed to meet his burden of demonstrating prejudice under any standard of review. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694; *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 838.)

"In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S.Ct. 2638, 110 L.Ed.2d 528] (*Muniz* ), the plurality opinion recognized a ' "routine booking question" exception which exempts from *Miranda* 's coverage questions to secure the "biographical data necessary to complete booking or pretrial services." ' (*Muniz,* at p. 601 (plur. opn. of Brennan, J.).) Quoting an amicus curiae brief, the plurality noted: ' "recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." ' (*Muniz,* at p. 602, fn. 14.) [¶] A concurring and dissenting opinion in *Muniz,* joined by four justices, presumed the validity of the ' "booking exception." ' (*Muniz, supra,* 496 U.S. at p. 607 (conc. & dis. opn. of Rehnquist, C.J.).)" (*People v. Williams* (2013) 56 Cal.4th 165, 187.) Thus, *Miranda* ' s "booking exception" is now well-recognized law. (*Ibid.*)

In *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde* ), our Supreme Court was faced with the issue of whether *Miranda* 's "well-recognized booking exception" extended to "routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges." (*Id.* at p. 527.) The court initially found "it is permissible to *ask* arrestees questions about gang affiliation during the booking process. Jail officials have an important institutional interest in minimizing the potential for violence within the jail population and particularly among rival gangs, which ' "spawn a climate of tension, violence and coercion." [Citation.]' (*Florence v. Board of Chosen Freeholders of County of Burlington* (2012) [566] U.S. __, __ [132 S.Ct. 1510, 1518].)" (*Elizalde, supra,* at p. 541.) The court went on to hold that the defendant's answers to unadmonished gang questions posed in that case were inadmissible in the prosecution's case-in-chief. (*Ibid.*) Nonetheless, the erroneous admission of the testimony was subject to harmless error analysis under *Chapman, supra,* 386 U.S. 18, and the court found the prosecution in that case had met its burden of proving beyond a reasonable doubt that the erroneous evidentiary ruling did not contribute to the verdict. (*Elizalde, supra,* at p. 542.)

In this case, we similarly conclude that even if Deputy Sheriff Trindade's testimony regarding defendant's admission of gang affiliation was erroneously admitted into evidence, there

was no prejudicial error under *Chapman, supra*, 386 U.S. 18. The record reflects that defendant's "gang affiliation was amply established by independent and uncontradicted evidence" from Sanchez, Ruelas, Antonio, and Menendez, who all testified they knew defendant to be a VFL gang member at the relevant times. (*Elizalde, supra*, 61 Cal.4th at p. 542.) Even if the jurors found that Ruelas and Menendez were accomplices, together with Sanchez, who was deemed to be an accomplice as a matter of law, their testimony and out of court statements were adequately corroborated by the testimony of San Pablo Police Detective Robert Brady, an expert on Norteno and Sureno criminal street gangs. (*Id.* at p. 542.) Brady opined that defendant was a VFL gang member, based on, among other things, defendant's association with other VFL gang members, identifications by gang member informants, and the fact that defendant was carrying a blue bandana when he was arrested in February 2008. The jury could also consider as corroborating evidence the testimony of the police that gang drawings and graffiti and notebooks with the notations of "Sur" and "13," were found in defendant's residence after his arrest on February 28, 2008. Accordingly, if the issue was properly before us, we would conclude defendant's claim of prejudicial error on this ground fails.

Camacho, 2016 WL 3680119, at *14-15.

Under a "doubly" deferential judicial review, the state appellate court did not unreasonably apply Strickland in rejecting Petitioner's argument. See Pinholster, 131 S. Ct. at 1410-11; Harrington, 131 S. Ct. at 88. As noted, supra, the state appellate court concluded that, even assuming the admission of Petitioner's statement of gang affiliation was erroneous, "there was no prejudicial error" because "defendant's 'gang affiliation was amply established by independent and uncontradicted evidence.'" *Id.* at *15. The record reveals that Petitioner's VFL membership was independently established by the testimony of other VFL members, by expert testimony, and by Petitioner's possession of "gang drawings and graffiti and notebooks with the notations of "Sur" and "13."" *Id.* Because Petitioner's VFL membership was established by ample independent evidence, counsel's failure to object to the admission of Petitioner's statement that he was a VFL member cannot be said to have prejudiced Petitioner.

Accordingly, Petitioner's claim for ineffective assistance of counsel fails.

### b. Claim 6B

In Claim 8B, Petitioner argues that defense counsel was ineffective in failing to

object to prosecutorial misconduct, specifically to the maligning of defense counsel.  (See Pet. at 36.)  Petitioner did not raise Claim 8B to the state appellate court. (See Ex. 6 at 97-99 (opening brief, arguing the prosecutor engaged in misconduct, but not arguing that trial counsel should have objected); see generally, Exs. 8 and 9 (reply brief and supplemental opening brief, failing to argue about prosecutorial misconduct at all).)  Accordingly, Petitioner has not exhausted this claim.  See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (explaining that, to exhaust, a petitioner must invoke "one complete round of the State's established appellate review process."); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").  While this Court may deny an unexhausted claim on the merits, see Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (holding a court may deny an unexhausted petition that fails to raise a federal claim), it may not grant an unexhausted claim, see 28 U.S.C. § 2254(b)(1) (a habeas petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies").

In addition to being unexhausted, Claim 8B fails on the merits.  The record reveals that the prosecutor did not engage in misconduct, and so defense counsel was not ineffective for failing to object.  The state appellate court held:

> [T]he prosecutor's closing remarks in rebuttal did not so infect the trial with unfairness as to deny defendant his Fifth and Fourteenth Amendment rights to due process or involve the use of deceptive or reprehensible methods to attempt to persuade the jury. "Although defendant singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (Cole, supra, 33 Cal.4th at p. 1203.) "Each of the statements about defense counsel was made in the context of rebutting a statement defense counsel had made during his closing argument." (Ibid.) Moreover, the prosecutor did not improperly quote or present a misleading version of the instructions as given by the trial court. "When the comments are considered in context, there is no likelihood that the jury would have understood the comments as anything beyond criticism of defense counsel's tactical approach in argument and the defense view of the evidence in the case, as is allowed. (People v. Huggins [ (2006) ] 38 Cal.4th [175,] 207; [Cole, supra, p. 1203].) The comments did not constitute an

United States District Court
Northern District of California

improper argument or an attack on counsel's personal integrity. (*People v. Chatman* (2006) 38 Cal.4th 344, 387 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Medina* ( 1995) 11 Cal.4th 694, 758–759 [47 Cal.Rptr.2d 165, 906 P.2d 2].)" (*Linton, supra,* 56 Cal.4th at p. 1206; see *Cole, supra,* at pp. 1201, 1203–1204 [prosecutor's comments in rebuttal that "defense counsel was attempting to 'mislead,' 'deceive,' or give the 'wrong idea' to, the jury; was 'sneaky'; was 'unfair' to the jury and to the characterization of evidence and the law; and 'wasn't being straight' with the jury," did not constitute improper personal attacks on defense counsel's integrity or otherwise infect trial "with such unfairness as to make the conviction a denial of due process" or "involve 'the use of deceptive or reprehensible methods to attempt to persuade ... the jury' "].) "We presume the jurors treated 'the comments as words spoken by an advocate in an attempt to persuade' (*People v. Clair, supra,* 2 Cal.4th [at p.] 663, fn. 8), and we find nothing in the record that would suggest otherwise." (*Cole, supra,* at p. 1204, fn.omitted.) Accordingly, defendant's claim of prosecutorial misconduct fails.  [FN 21]

> [FN21:  We are not persuaded by defendant's reliance on *Hill, supra,* 17 Cal.4th at p. 832; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1200; *People v. Thompson* (1988) 45 Cal.3d 86, 112, *People v. Fierro* (1991) 1 Cal.4th 173, 212, and *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796. Those cases are factually inapposite from this case, and, in all events, do not warrant reversal of defendant's convictions on the ground of prosecutorial misconduct.]

Camacho, 2016 WL 3680119, at *18.

The record reveals that any objection to the prosecutor's alleged misconduct would have been meritless.  Accordingly, the state appellate court's rejection of this claim was not unreasonable, because counsel did not give an incompetent performance in the trial court.  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986). Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).  A prosecutorial

33

1    misconduct claim is decided "'on the merits, examining the entire proceedings to

2    determine whether the prosecutor's remarks so infected the trial with unfairness as to make

3    the resulting conviction a denial of due process.'" <u>Johnson v. Sublett</u>, 63 F.3d 926, 929

4    (9th Cir. 1995); <u>see</u> <u>Trillo v. Biter</u>, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to

5    punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the

6    petitioner received a fair trial."). Even if there was misconduct, a habeas petitioner is not

7    entitled to relief unless the misconduct "'had substantial and injurious effect or influence

8    in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)

9    (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). In other words, state

10   prisoners seeking federal habeas relief may obtain plenary review of constitutional claims

11   of trial error, but are not entitled to habeas relief unless the error resulted in "actual

12   prejudice." <u>Id.</u> (citation omitted); <u>see e.g.</u>, <u>Johnson</u>, 63 F.3d at 930 (finding prosecutorial

13   vouching "could not have had substantial impact on the verdict necessary to establish

14   reversible constitutional error" under <u>Brecht</u>).

15       Here, a review of the record reveals that the challenged statements were not

16   misconduct, and so counsel was not ineffective in failing to object to them.

17       Petitioner first challenges the prosecutor's statement to the jury that defense counsel

18   was trying to "get you to take your eye off of what really happened, off of the truth." (Pet.

19   at 41.) Courts are instructed to consider, among other things, "whether the [prosecutor's]

20   comment was invited by defense counsel in summation." <u>Trillo v. Biter</u>, 769 F.3d 995,

21   1001 (9th Cir. 2014). A prosecutor may fairly rebut defense counsel's contentions. <u>See</u>

22   <u>United States v. Bagley</u>, 772 F.2d 482, 494 (9th Cir. 1985). Here, when the challenged

23   statement is read in context, it is clear that the prosecutor was rebutting defense counsel's

24   arguments rather than maligning defense counsel personally:

25           That brings me to the next point I want to address, the
         defense attorney criticized the job that the San Pablo Police
26       Department did in this case a lot.
             Part of that is because, ladies and gentlemen, is so
27       overwhelming in this case that it serves them that it is beneficial
         to get you to look somewhere else.

28
                                          34

> That Detective Gancasz, he is a jerk.
> Brady, sarcastic.
> Detective Benone, he made up that really mean ruse about the videotape.
> Criticism of the police to get to you take your eye off of the ball, to get you to take your eye off of what really happened, off of the truth.
> Ladies and gentlemen, the San Pablo Police Department, first of all, did an amazing job with this investigation.

(Tr. at 3881:18-3882:7.)  Because it is clear from context that the prosecutor was referring to defense counsel's tactics at trial and rebutting defense counsel's arguments, and the comments "did no more than respond substantially in order to 'right the scale,' [the] comments [do] not warrant reversing [Petitioner's] conviction."  United States v. Young, 470 U.S. 1, 12–13 (1985).  Accordingly, the state appellate court reasonably found no evidence of prosecutorial misconduct in this regard.  Therefore, it cannot be said that counsel rendered deficient performance by failing to make a meritless objection.  See Juan H., 408 F.3d at 1273.


Similarly, Petitioner directs the Court's attention to "20 RT 3877-3878."  (Pet. at 41.)  On those pages of the transcript, the prosecutor stated that he was not misrepresenting the law, and that it was in the defense's interests rather than the prosecution's to misrepresent the law.  (See Tr. at 3877:5-3878:25.)  Read in context, it is clear that the prosecutor was responding to defense counsel's provocation.  Specifically, defense counsel stated:

> My colleague, my young colleague, who has got good computer skills, has repeated those parts of the Judge's instructions which favor him, you know, set them up dramatically, kind of like a good beer ad or something. I mean, very, very well done presentation, use of media, bombarding us with comparisons and arrows and so that we get this impression.
> It's -- it's a good technique and it works in selling products, and we know that. Otherwise, companies wouldn't do it, but in law we – we should rationally consider things. You have to trust the Judge's instructions, not the views that you get from the lawyers.

(Tr. at 3850:13-26.)  Defense counsel thus appears to have suggested to the jury that the prosecutor had provided misleading excerpts, which gave an "impression" the jury should

1    not "trust." It appears that the prosecutor did no more than "right the scale" in response to

2    defense counsel's provocation, and so did not engage in misconduct. Again, because there

3    was no prosecutorial misconduct, it cannot be said that counsel rendered deficient

4    performance by failing to make a meritless objection. See Juan H., 408 F.3d at 1273.

5        Finally, even if the prosecutor had engaged in misconduct, any failure to object

6    would not have prejudiced Petitioner in the context of this case. As noted several times

7    above, the evidence against Petitioner was "ample" to the point of being overwhelming.

8    Petitioner was found guilty of participation in a criminal street gang (see Pet. at 8), and the

9    jury received evidence in the form of witness testimony, expert testimony, physical

10   evidence, and Petitioner's own statements that he was a member of a criminal street gang.

11   Petitioner was convicted of conspiracy to commit murder (see id.), and the jury heard

12   testimony from multiple witnesses that VFL members decided to kill Norteños in order to

13   "bring back" VFL's prestige. Petitioner was found guilty of murdering three people (see

14   id.), and the jury heard testimony from two eyewitnesses who had seen Petitioner murder

15   Luis Perez, an eyewitness who saw Petitioner murder Lisa Thayer, and an eyewitness to

16   the Rico McIntosh murder who testified that the shooting was in furtherance of the

17   conspiracy. In light of all this evidence, the Court cannot conclude that Petitioner was

18   prejudiced by the prosecutor's rebuttal statements.

19       Accordingly, Petitioner is not entitled to relief on Claims 6B and 8B.

20       **5.     Eighth Amendment Claim**

21       Petitioner's final claim is that his sentence to life imprisonment without the

22   possibility of parole ("LWOP") constitutes cruel and unusual punishment. (See Pet. at 43-

23   46.) Petitioner argues that the United States Supreme Court has found that an LWOP

24   sentence for a juvenile is unconstitutional, and that Petitioner was little more than a

25   juvenile when he committed the two murders. (See id. at 43.) Petitioner argues that

26   because he was "immature [and] impetuous," he should be entitled to "the constitutional

27   presumption of 'lessened culpability.'" (Id. at 45.)

28

The state appellate court rejected this argument on direct appeal:

> Relying on *Miller v. Alabama* (2012) 567 U.S. —— [132 S.Ct. 2455], *Graham v. Florida* (2010) 560 U.S. 48, and *Roper v. Simmons* (2005) 543 U.S. 551, defendant argues the rationale applicable to the sentencing of juveniles should apply to him because he committed the February 2008 murders of Perez and Thayer only nine months after his 18th birthday. However, in adopting a categorical rule barring imposition of the death penalty on any offender under 18 years of age, the United States Supreme Court in *Roper v. Simmons, supra,* 543 U.S. 551, explained: "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach.... [H]owever, a line must be drawn.... The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Id.* at p. 574.) "Making an exception for a defendant who committed a crime just [nine] months past his 18th birthday opens the door for the next defendant who is only [ten] months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes and conclude [defendant's] sentence[s] [are] not cruel and/or unusual...." (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [court declined to apply juvenile sentencing principles to 18–year–old defendant who was convicted of first-degree murder, as a principal, rejecting his argument that he was entitled to relief because the offense was committed five months after his 18th birthday].)
>
> We also reject defendant's argument that the Eighth Amendment precludes mandatory LWOP sentences in his case. Defendant asks us to consider that he was "just" 18 years old at the time of the crimes, he could not be described as a mature adult at that time, and as a matter of developmental, psychological reality, he did not transform from an immature minor to mature adult, when he turned 18 years of age, thereby being rendered incapable of ever being rehabilitated. Defendant concedes the jury found he shot and killed two people, but he asserts he committed those crimes as "an article of faith that every member of the VFL was expected to shoot people believed to be Nortenos," and his situation is "a paradigm case of a violent gang culture leading a troubled, immature, impetuous youth to commit violent crimes." However, none of the mentioned factors render the sentences unconstitutional under either the federal or state Constitutions.

Camacho, 2016 WL 3680119, at *19.

This Court agrees with the state appellate court's determination. In the last fifteen

years, the U.S. Supreme Court has issued opinions discussing the application of the Eighth Amendment to juvenile offenders: <u>Roper v. Simmons</u>, 543 U.S. 551, 578 (2005) (holding that the Eighth Amendment forbids the "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed"), <u>Graham v. Florida</u>, 560 U.S. 48, 82 (2010) (holding that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender <u>who did not commit homicide</u>") (emphasis added), and <u>Miller v. Alabama</u>, 567 U.S. 460, 465 (2012) (holding that "mandatory life without parole [sentences] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'"). However, petitioner was not legally a juvenile at the time of the crimes at issue in this case. Neither <u>Miller</u>, nor <u>Graham</u>, nor <u>Roper</u> precludes an LWOP sentence for an adult offender.

As Petitioner concedes (<u>see</u> Pet. at 44-46), the Supreme Court in <u>Roper</u> chose to draw a line for special sentencing rules, and set that line at age 18.

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson[ v. Oklahoma*, 487 U.S. 815 (1988) ] drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

<u>Roper</u>, 543 U.S. at 574. That dividing line did not get moved by <u>Graham</u> or <u>Miller</u>. The Supreme Court cases thus mandate special consideration only for juvenile offenders (i.e., those offenders who committed their offenses while under age 18), and do not mandate special consideration of offenders who committed their offenses at age 18 or later. Because Petitioner was legally an adult at the time he murdered two people, and at the time he is legally liable for a third murder, the holdings of <u>Roper</u>, <u>Graham</u> and <u>Miller</u> do not apply to him. The U.S. Supreme Court has not determined that young adult offenders have

38

a right to the same consideration as juvenile offenders for sentencing purposes.

Because Miller, Graham, and Roper do not apply, Petitioner's Eighth Amendment rights must be analyzed under general Eighth Amendment jurisprudence. Under that case law, his claim fails because the Eighth Amendment does not prohibit a life sentence for a person convicted of murder. "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." Graham, 560 U.S. at 59. "For the most part, however, the [Supreme] Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime." Id. The Eighth Amendment contains a "narrow" proportionality principle—one that "does not require strict proportionality between crime and sentence," and forbids only "extreme sentences that are 'grossly disproportionate' to the crime." Id. at 59-60. "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare." Solem v. Helm, 463 U.S. 277, 289-90 (1983); see also Crosby v. Schwartz, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme, and constitutional violations on that ground are 'only for the extraordinary case' "). Only in that rare case where a comparison of the gravity of the offense and the severity of the sentence leads to an inference of gross disproportionality does a court compare a petitioner's sentence with sentences for other offenders in the jurisdiction and for the same crime in other jurisdictions to determine whether it is cruel and unusual punishment. Graham, 560 U.S. at 60. Binding precedent establishes that a sentence of life in prison for murder does not lead to an inference of gross disproportionality, and therefore does not amount to cruel and unusual punishment forbidden by the Eighth Amendment. See United States v. LaFleur, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin*, it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment"); Scott v. Kernan, 37 F.3d 1506 (9th Cir. 1994) ("a life term is not cruel and unusual punishment for first degree murder"); cf. Solem, 463 U.S. at 290 n.15 (discussing earlier case in which it had

found the death penalty to be excessive for felony murder in the circumstances of a particular case; "clearly no sentence of imprisonment would be disproportionate" for the felony murder of an elderly couple). Courts in this District have repeatedly applied this principle in cases where the petitioner was a young adult. See Adams v. Frauenheim, No. 17-CV-01289-EMC, 2018 WL 3046939, at *8 (N.D. Cal. June 14, 2018) (petitioner was 18 years and 5 months old at the time he committed murder); Royston v. Grounds, No. C 12-3665 EMC PR, 2012 WL 5504191, at *2 (N.D. Cal. Nov. 13, 2012) (petitioner was 20 years old at the time he committed murder); Brooks v. Walker, No. C 09-1355 LHK PR, 2011 WL 902946, at *7 (N.D. Cal. Mar. 15, 2011) (petitioner was 21 years old when he committed murder); cf. United States v. Mitchell, 502 F.3d 931, 981 (9th Cir. 2007) (affirming capital sentence for 20-year-old, despite petitioner's argument "that it would violate the Eighth Amendment to sentence him to death because of his age and maturity level"). Accordingly, Petitioner's LWOP sentences do not raise an inference of gross disproportionality. See United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990) (generally, "so long as the sentence imposed does not exceed the statutory maximum, it will not be overturned on eighth amendment grounds").

For the reasons stated above, the state appellate court's rejection of Petitioner's Eighth Amendment claim was not contrary to or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court. The state appellate court reasonably determined the sentence was permissible under the Eighth Amendment. The state appellate court's decision was not an unreasonable application of Miller or any other decision clearly establishing federal law. As noted above, Miller's holding applied only to juvenile offenders; Petitioner was not a juvenile. Although the Court recognizes the harshness of the result, Petitioner is not entitled to the writ on this claim.

## IV. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: _11/15/2019_

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California